## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

MARY E. KENDALL,                                :
                                                :
              Plaintiff,                        :
                                                :
       v.                                       :       Civ. No. 05-698-LPS
                                                :
MICHAEL J. ASTRUE,[1]                           :
Commissioner of Social Security,                :
                                                :
              Defendant.                        :

Stephen A. Hampton, GRADY & HAMPTON, L.L.C., Dover, Delaware. Attorney for Plaintiff.

Colm F. Connolly, United States Attorney, and David F. Chermol, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware; Donna L. Calvert, Regional Chief Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

### MEMORANDUM OPINION

February 28, 2008
Wilmington, Delaware

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner Joanne B. Barnhart.

*[signature]*

**STARK, U.S. Magistrate Judge**

## I. INTRODUCTION

Plaintiff Mary E. Kendall ("Kendall") appeals from a decision of Defendant Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying her application for

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-

33. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405 (g).

Presently pending before the Court are cross-motions for summary judgment filed by

Kendall and the Commissioner. (D.I. 15, 19) Kendall's motion asks the Court to reverse

defendant's decision and award her DIB or, in the alternative, to remand for further proceedings

before the Commissioner. (D.I. 15) The Commissioner's motion requests that the Court affirm

his decision. (D.I. 19) For the reasons set forth below, Kendall's motion for summary judgment

will be granted in part and denied in part and the Commissioner's motion for summary judgment

will be denied.

## II. BACKGROUND

### A.    Procedural History

Kendall filed an application for DIB with the Social Security Administration on July 23,

2003. Transcript ("Tr.") at 83. That application was denied initially on January 30, 2004 and

again denied on reconsideration on May 26, 2004. Tr. at 36-46. Kendall subsequently submitted

a request for an appeal before an administrative law judge ("ALJ"). Tr. at 42-43. The appeals

hearing was held before ALJ Judith Showalter on February 24, 2005. Tr. at 254-316. Kendall,

who was represented by a non-attorney advocate, testified, as did her daughter and a vocational

expert. *Id.* On March 10, 2005, the ALJ issued a decision confirming the denial of benefits to

1

Kendall. Tr. at 19-31. On September 9, 2005, the Appeals Council denied Kendall's request for review. Tr. at 7-10. Thus, the ALJ's adverse decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On September 23, 2005, Kendall filed a Complaint seeking judicial review of the ALJ's March 10, 2005 decision. (D.I. 2) On September 15, 2006, Kendall moved for summary judgment. (D.I. 15) The Commissioner filed a cross-motion for summary judgment on November 22, 2006. (D.I. 19) Thereafter, on December 21, 2007, the parties consented to the jurisdiction of a United States Magistrate Judge. (D.I. 27)

## B.    Factual Background

### 1.    Plaintiff's Medical History, Treatment, And Condition

At the time she filed the relevant DIB application in July 2003, Kendall was fifty-nine years old. Tr. at 83. She had completed the tenth grade in high school, and had past work experience as a school cafeteria manager, nursing home and restaurant worker, and fast food manager. Tr. at 259, 86-91.

Kendall claims to have been disabled since February 10, 2002, four days after she left her place of employment due to depression, anxiety, high blood pressure, headaches, and stress. Tr. at 67, 266. Her claimed disability arose over a period of several years.

Kendall's family physician, Dr. Kin Wun, first prescribed her the anti-anxiety medication Ativan in 1980 after Kendall complained of nervousness, sleeplessness, and other personal problems. Tr. at 195. He again prescribed her Ativan in 1981. Tr. at 194. In 1984, Dr. Wun prescribed more Ativan for Kendall's anxiety and Desyrel to treat her depression over a broken

2

engagement. Tr. at 194. In 1986, in response to Kendall's renewed complaints of nervousness

and depression, Dr. Wun initially prescribed Desyrel, followed by Ativan. Tr. at 193.

In 1993, Dr. Wun noted that Kendall was being treated by a Dr. Bartley with Prozac and

Lorazepan. Tr. at 188. Dr. Wun refilled her Prozac prescription in 1994, prescribed Prozac and

Lorazepan again in 1995, and refilled all of her medications, including Ativan, in 1996. Tr. at

185-87. He continued to treat Kendall with Ativan, Lorazepan, and Prozac from 1997 to 1999.

Tr. at 178-79, 181-82. On April 26, 2000, Dr. Wun noted that Kendall was depressed but was not

experiencing mood swings or thoughts of hurting herself. Tr. at 176. He increased her dosage of

Prozac and, at a follow-up appointment one month later, noted that her symptoms of depression

had improved. *Id.* Dr. Wun continued Kendall on the same anti-depression medications through

the end of 2000. Tr. at 175.

Kendall's condition apparently worsened by August 30, 2001, when Dr. Wun noted that

she was very upset and crying because her father was extremely ill. Tr. at 172. Dr. Wun's

diagnosis was depression, anxiety, and hypertension, for which he prescribed Prozac and Ativan.

Tr. at 172. The Ativan prescription was renewed on September 10, 2001. *Id.* On October 10,

2001, Dr. Wun diagnosed Kendall with neurodermatitis and anxiety, noting that she was breaking

out in a rash and suffering from nervousness in the wake of her father's death one month before.

*Id.* Dr. Wun prescribed medications including Ativan for anxiety and Halcion for depression. *Id.*

On November 27, 2001, Dr. Wun noted that Kendall's anxiety had improved and refilled her

prescription for Lorazepan. Tr. at 171.

On January 31, 2002, Kendall appeared tearful before Dr. Wun. Tr. at 171. She told the

doctor that she had suddenly become withdrawn and had enclosed herself in a dark room. *Id.* Dr.

3

Wun prescribed Xanax for anxiety and referred Kendall to a psychiatrist. *Id.* At a follow-up appointment in February 2002, Kendall reported no complaints and an improvement in her anxiety. Tr. at 169. Dr. Wun noted that Kendall had recently quit her job as a school cafeteria manager, a position she had held since 1994. Tr. at 170, 68. Kendall's insurance ran out after she left her job and she did not visit Dr. Wun for another two years. Tr. at 169, 210.

On July 23, 2003, Kendall protectively filed for DIB. Tr. at 83. On August 5, 2003, a Social Security representative conducted a telephone interview with Kendall. The interviewer described Kendall's manner as pleasant and stated that she had no difficulties concentrating, talking, answering, hearing, reading, breathing, understanding, or communicating coherently during the interview. Tr. at 84.

In a Daily Activities Questionnaire from approximately mid-October 2003, Kendall reported that she lived alone; dressed in the morning and ate breakfast if she felt like it; tried to do such chores as laundry and household cleaning; forced herself to go grocery shopping once a week; drove a car; prepared meals for herself 2-3 times per week; had no money and lived off credit cards; had her home up for sale; watched television; read self-help books for about half an hour at a time; did not participate in any recreational activities; spoke to her adult daughters 2-3 times per week; did not want to bother other people because she felt "worthless, with nothing to offer;" did not need any help with personal needs like bathing and grooming; and felt anxiety "all the time." Tr. at 94-99.

On November 26, 2003, Dr. Randy Rummler performed a consultative mental health evaluation of Kendall for purposes of her disability evaluation. Tr. at 140-43. Kendall stated to Dr. Rummler that she "stays depressed essentially 100% of the time." Tr. at 140. She reported

4

that sitting on a chair and occasionally watching television were her only source of activity. *Id.* Kendall stated that her appetite and energy were variable; her concentration was poor; and that she could sleep 3-4 hours at a time, but only with the benefit of medication. *Id.* She also stated that she purchased and read self-help books. Tr. at 141. She reported that upon entering a room in which others were already present, she would sometimes experience panic symptoms. *Id.* She informed Dr. Rummler that she was divorced; had no contact with her only son; visited sporadically with her two daughters; was experiencing financial difficulties; had her house up for sale; stopped working in February 2002 due to her nerves; drove a car; did her own cooking and cleaning; had fair concentration; was able to understand directions and take medications independently; cared for her own personal needs; and disliked public places. Tr. at 142.

Kendall told Dr. Rummler that she was not on any medications for depression or hypertension because she could not afford them. Tr. at 140-41. Dr. Rummler noted that Kendall had not received mental health treatment since 1992, after her doctor at a mental health clinic died and she declined to "start all over" with a new doctor. Tr. at 140.[2] Kendall reported that she was hospitalized in 1990 for suicidal ideation. Tr. at 141. She denied any recent suicide attempts or feelings of worthlessness. Tr. at 142.

Dr. Rummler's mental health examination found that Kendall was appropriately dressed and groomed, alert, cooperative, and coherent. *Id.* Her eye contact was fair; speech was

---

[2]Kendall disputes the accuracy of Dr. Rummler's statement that "the patient has been untreated for the last seven years and for a significant amount of time was able to work." (D.I. 16 at 22 (citing Tr. at 142)) She claims that the statement is contradicted by the medical records of her personal physician Dr. Wun and by a letter from Regional Mid-Shore Mental Health Services. Tr. at 138, 170-88. However, Dr. Wun is an internist and not a mental health specialist, and the Regional Mid-Shore letter confirms that her last appointment there was more than seven years before her evaluation with Dr. Rummler.

spontaneous and productive; her affect mildly constricted; and her attention and memory intact. *Id.* Kendall's insight into her psychiatric symptoms was deemed poor, though her overall insight and judgment were found fair. *Id.* Dr. Rummler's Axis I diagnosis was major depression, mild, with recurrent panic disorder with agoraphobia. *Id.* He assigned Kendall a score of 60 on the Global Assessment of Functioning (GAF) scale, which is indicative of moderate symptoms. *Id.*[3] Dr. Rummler concluded that Kendall did not appear to be severely depressed and that "the current level of symptoms would not present significant impairment in her ability to work." Tr. at 142-43. He recommended appropriate medication and therapy to enable Kendall to "mobilize herself to more fruitful activities than at present." Tr. at 142.

On December 2, 2003, Kendall had a consultative evaluation with Dr. Christian E. Jensen. Tr. at 144-46. Dr. Jensen found Kendall to have a robust and healthy appearance and a normal gait. Tr. at 144. She was alert, oriented to time and place, outgoing, and communicated "with ease." *Id.* A physical examination found that Kendall was able to move around the examination room and on the exam table and scale without difficulty. Tr. at 145. Dr. Jensen found no restrictions on Kendall's ability to sit, stand, walk, lift, hear, speak, carry and handle objects, or travel. *Id.* He did, however, note that Kendall's blood pressure was "strikingly elevated." Tr. at 145. Dr. Jensen's report notes that Kendall stated, "I don't have anything wrong with me except my nerves." Tr. at 146.

On January 5, 2004, Dr. William R. Hakkarinen, a state agency medical consultant,

---

[3]The GAF scale is a numeric scale from zero through 100 and is used by mental health clinicians to rate the occupational, psychological, and social functioning of adults. The scale was devised by the American Psychiatric Association. AMERICAN PSYCHIATRIC ASS'N., DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000) (DSM-IV).

6

reviewed Kendall's medical record and found that she did not have any physical limitations and that her condition was "medically not severe." Tr. at 164.

On January 29, 2004, a state agency psychiatrist, Dr. Carolyn E. Butler, reviewed Kendall's medical record and concluded that Kendall suffered from mild depression with mild anxiety. Tr. at 152. Dr. Butler noted that Kendall had a medically determinable mental impairment that did not precisely satisfy the diagnostic criteria of any listed impairment. Tr. at 149-64. Dr. Butler further assessed Kendall's mental residual functional capacity (RFC). Tr. at 134-37. She determined that Kendall had moderate limitations in six of twenty mental activities evaluated, including the ability to work within a schedule and maintain regular attendance, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without exhibiting behavioral extremes. *Id.* Kendall had either no limitations or no significant limitations in the other fourteen tested areas. *Id.*

On February 8, 2004, Kendall's personal physician, Dr. Wun, who had not treated her since February 2002, phoned her at home and urged her to come in to receive samples of hypertension medication. Tr. at 169, 210. On February 19, 2004, Kendall told Dr. Wun that she had not been treating her hypertension with medication because she was out of work and could not afford it. Tr. at 169. He provided her with blood pressure medicine samples and diagnosed her with anxiety. *Id.* On February 26, 2004, Kendall returned to Dr. Wun and was diagnosed with anxiety and was prescribed Xanax. *Id.* At a follow-up appointment on April 1, 2004, Kendall reported to Dr. Wun that she was nervous and cried easily. He diagnosed her with depression and prescribed Lexapro. *Id.*

On April 28, 2004, Dr. Wun completed a medical questionnaire about Kendall for

7

purposes of her disability evaluation. Tr. at 165-67. He reported that Kendall suffered from hypertension, anxiety, and severe depression, for which she was being treated with Lexapro and Xanax, but that her condition had not resulted in physical limitations on activities such as sitting, standing, carrying, or using her hands for repetitive actions. Tr. at 166-67. Dr. Wun found that Kendall experienced no functional restriction in the activities of daily living; moderate difficulties in maintaining social functioning; frequent difficulty in maintaining concentration, persistence, or pace; and continual repeated episodes of decompensation, each of extended duration. Tr. at 168. Dr. Wun stated his opinion that Kendall's condition would prevent her from working from April 1, 2004 through March 31, 2005. *Id.* He did not include additional comments explaining his conclusions. *Id.*

On May 18, 2004, state psychiatrist Dr. M. Apacible affirmed state psychiatrist Dr. Butler's findings and RFC assessment of Kendall. Tr. at 136.

On August 11, 2004, Dr. Wun continued Kendall on all her medications. Tr. at 209. He also noted a clinical impression of diabetes mellitus. *Id.* Kendall's blood pressure was normal. *Id.* On August 27, 2004, Kendall reported "no complaints" to Dr. Wun. *Id.*

In September 2004, Kendall recommenced mental health treatment at Regional Mid-Shore Mental Health Services, where she had previously been a patient intermittently from 1986 to 1995. Tr. at 230, 138. On September 8, 2004, Kendall met with Linda Gadow, R.N., a psychiatric nurse, who reported that Kendall complained of depression, isolation, and anhedonia. Tr. at 230. Kendall reported to Nurse Gadow that she had been abused by her husband of fourteen years and by two boyfriends after her divorce. *Id.* She expressed her frustration that she no longer cleaned her home the way she used to and her hope that her neighbors would not bother her. *Id.*

8

Kendall's mood was dysthymic and her affect constricted.  *Id.*  She denied thoughts of suicidal

ideation; she reported that she enjoyed NASCAR racing and was keeping an album on her favorite

driver.  *Id.*

On September 22, 2004, Kendall reported to Nurse Gadow that she was having financial

problems and feelings of hopelessness and depression.  Tr. at 229.  She described a 1993 suicide

attempt but denied any current thoughts of suicidal ideation.  *Id.*  Her mood was dysthymic and

affect constricted.  *Id.*

On October 5, 2004, Kendall told Dr. Wun her depression was improving.  Tr. at 209.  Her

blood pressure reading was normal.  *Id.*

On October 8, 2004, Regional Mid-Shore Mental Health Services prepared an individual

treatment plan for Kendall, who was diagnosed with Axis I major depressive disorder, recurrent,

with no psychotic symptoms.  Tr. at 227.  She was assigned a current GAF of 48 (linked to serious

symptoms or any serious impairment in social, occupational, or school functioning), with her

highest GAF in the previous year listed as 55 (moderate symptoms or impairment).  *Id.*  On

October 20, 2004, Nurse Gadow noted that Kendall's affect was brighter than on her last visit and

that she smiled easily.  Tr. at 226.  Kendall also discussed her affection for her pets.  *Id.*

On November 3, 2004, Dr. Indirarani D. Prasad, Kendall's new treating psychiatrist at

Regional Mid-Shore, performed an initial psychiatric evaluation.  Tr. at 222-25.  Kendall stated

that she still felt depressed and withdrawn, with decreased energy.  Tr. at 222.  On mental status

examination, she was fully oriented and cooperative, with fair judgment, a depressed mood, and

anxious affect.  Tr. at 223.  She denied feelings of suicidal ideation, other than passive suicidal

ideation – an expressed wish to be dead of natural causes.  *Id.*  Dr. Prasad's Axis I diagnosis was

9

recurrent major depression, severe, with generalized anxiety disorder. Tr. at 224. Kendall was assigned a current GAF of 55, and a maximum GAF over the past year of 60, scores indicative of moderate symptoms or impairments. *Id.*

On November 19, 2004, Nurse Gadow noted that Kendall's mood was depressed and her affect tearful. Tr. at 221. She denied suicidal ideation and reported her plan to keep to herself over the holidays because she could not tolerate social gatherings. *Id.* On November 29, 2004, Kendall's mood was dysthymic and her affect tearful. Tr. at 220. She discussed her ongoing stress related to her attempts to sell her home and stated that she only left her home once a week. *Id.*

On December 2, 2004, Kendall spoke to Dr. Prasad at length about her problems with her home and her feelings of helplessness and worthlessness. Tr. at 219. Dr. Prasad recommended an increase in the dosage of Kendall's psychiatric medication, including Prozac, Triavil, and Ativan. *Id.* On December 6, 2004, Nurse Gadow noted that Kendall's mood was euthymic and her affect brighter, with no tearfulness. Tr. at 218. On December 13, 2004, Kendall's mood was again euthymic and her affect brighter and appropriate. Tr. at 217. She reported to Nurse Gadow that she was feeling better but "almost afraid to say it." *Id.* On December 27, 2004, Kendall's mood was improved despite her ongoing financial issues, and she reported that she spoke with her brother once a week. Tr. at 216. She stated that she was thinking about returning to work but the thoughts caused a depression in her mood, prompting her to realize that she was not yet ready. *Id.* On December 30, 2004, Dr. Prasad's notes reflect that Kendall was "feeling much better with [an] improved mood." Tr. at 215. Her medication levels were not adjusted and the doctor suggested an eight week interval before her next appointment. *Id.*

10

On January 3, 2005, Kendall reported to Nurse Gadow that her sleep had improved and that she was feeling much better on brand-name Prozac. Tr. at 214. Nurse Gadow's notes for January 10, 2005 state that Kendall "proudly reported she feels better!" Tr. at 213. Her mood was euthymic and her affect bright and appropriate. *Id.* But on January 18, 2005, Kendall reported feeling depressed. Tr. at 212.

On January 27, 2005, Dr. Prasad completed an Affective Disorders diagnostic form, in which she noted that Kendall suffered from an affective disorder characterized by anhedonia, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. at 232. Kendall was found to have marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace; and to have once or twice experienced episodes of decompensation of extended duration. Tr. at 233. Dr. Prasad checked a box indicating the presence of a residual disease process such that "even a minimal increase in mental demands or change in the environment" would cause Kendall to decompensate. Tr. at 234. Kendall's RFC was found to be "markedly limited" in two of three areas related to understanding and memory, five of seven areas related to sustained concentration and persistence, and in all eight areas related to social interaction and adaptation. Tr. at 235-36. She was found to be "moderately limited" in her ability to sustain an ordinary routine without special supervision and "not significantly limited" in the ability to understand and remember simple instructions and carry them out. *Id.* Dr. Prasad did not provide a report explaining her findings. Tr. at 232-36.

### 2.    The Administrative Hearing

At Kendall's administrative hearing, the ALJ heard the testimony of Kendall; her

11

daughter, Kimberly K. Pearson; and Joseph Rose, an impartial vocational expert.  Tr. at 254-316.

### a.    Kendall's Testimony

Kendall testified that she left school in eleventh grade for the same reason that she left her last job: because she could not cope.  Tr. at 259-60.  Her father died in September 2001 and after his death she felt she had lost her best friend.  Tr. at 264-65.  She acknowledged a history of anxiety but felt that her father's illness triggered everything that "since . . . happened to me."  Tr. at 293.  She quit her job in February 2002, feeling burnt out.  *Id.*  She stayed in her house for three months after leaving her job, then began to seek other employment by searching the internet and preparing resumes.  Tr. at 265.  She looked for work for one year before deciding to apply for DIB.  Tr. at 265-66.

Kendall testified that she is most limited in her daily life by anxiety, depression, and panic attacks.  Tr. at 266.  She sought treatment at Regional Mid-Shore Mental Health Services from 1986 until 1995 but left after her psychiatrist died, because she was still getting Prozac and Ativan from her primary care physician.  Tr. at 267.  She did not see a doctor for any reason for a year and a half after she left her job in 2002.  *Id.*  She resumed treatment with Dr. Wun in February 2004 when he offered her samples of medicine for her high blood pressure, which has since been controlled.  Tr. at 268, 276.  At this time Dr. Wun also provided her with samples of Xanax and Lexapro for her mental health issues.  Tr. at 268.  She resumed specialized mental health treatment in September 2004.  Tr. at 269.  She testified that Dr. Wun helped her apply for medical assistance and that she was currently seeing a therapist weekly and a psychiatrist monthly.  *Id.*

Kendall testified that she cried frequently, wished she were dead but would never physically harm herself, and felt that other people dislike her and are jealous and out to get her.

12

Tr. at 271. She further stated that she could not concentrate, suffered from sleep disturbances and an inconsistent appetite, had gained a significant amount of weight, felt worthless, experienced panic attacks when she worked, and was able to hide her irritability because "I'm a good actress." Tr. 271-73. She felt that the medication she had received since resuming treatment over the past year had made her symptoms "somewhat better." Tr. at 273.

Kendall further testified that she made herself take care of her personal hygiene three or four times a week, prepared simple meals, cleaned her bathtub, did the laundry, went grocery shopping about once a month, drove herself to her weekly therapy appointments and other doctor appointments, and received visits from her adult daughters. Tr. at 280-83. She stated that she had no friends and spent a typical morning "trying to get functional" and feeding her pets (two cats and ten chickens). Tr. at 283, 292. Her reason for not having friends was both that she could not afford to go places and because she did not want to go out. Tr. at 285. She gets fidgety and depressed around other people, including her own children. Tr. at 289. She acknowledged one longtime friend who she speaks to every 2-3 weeks. Tr. at 284-85. She enjoys watching NASCAR racing on televison. Tr. at 287.

Kendall also testified that she could read "general things" but had difficulty spelling and could perform only simple math. Tr. at 259-60. She credited her therapist with enabling her to apply for a library card and check out books. Tr. at 274. She lost interest in the one self-help book she checked out and returned it, but expressed a desire to take out more books. Tr. at 286. She had placed her house on the market, but her nerves forced her to leave when the realtors showed the house. Tr. at 289-90.

### b.    Ms. Pearson's Testimony

Kendall's adult daughter, Kimberly K. Pearson, testified that her mother repeatedly refused to open her door to realtors who were scheduled to come show her home, had left her phone off the hook for three days out of the past week, and did not want to be around people. Tr. at 299-300. She called her mother twice a day and attempted to visit her at home at least once a week to clean, check on the pets, and pay the bills. Tr. at 301-02. Pearson said that her mother had mood swings during her visits; Pearson believed the psychiatric treatment was not helping. Tr. at 303. She stated that Kendall had a close friend whom she normally spoke to by phone at least twice each week but whom Kendall had not seen or spoken to for about two weeks. Tr. at 304. Ms. Pearson further testified that during her mother's employment as a school cafeteria worker and manager, Kendall would find it difficult to adjust to changes in her routine, particularly when she returned from summer vacation. Tr. at 309-10.

### c.    The Vocational Expert's Testimony

Vocational expert Joseph A. Rose testified by phone. The ALJ asked Rose to consider a hypothetical individual of Kendall's age, education level, and work history, who did not have any exertional limitations but was restricted to simple, unskilled, low stress work that was essentially isolated and involved only occasional contact with supervisors and others. Tr. at 313. The ALJ asked if, in Rose's opinion, such an individual would be able to perform any of Kendall's past relevant work. *Id.* Rose answered that she could not, but that she could perform two other light, unskilled jobs existing in the national and regional economy: nonprecision assembler working with paper products and packer. Tr. at 313-14. He testified that there were 324,000 nonprecision assembly jobs in the national economy and 4,000 such jobs in the local economy (within a 60-85

14

mile radius of Dover, Delaware) and in excess of 329,000 packer positions in the national economy and approximately 1400 jobs locally. Tr. at 313-14. His testimony regarding these positions was consistent with their descriptions as found in the *Dictionary of Occupational Titles.* Tr. at 314.

Rose further testified that if the ALJ considered Kendall's testimony as to her limitations to be credible and found that the medical records supported her purported limitations, it was his opinion that she could perform neither her past relevant work nor any other work. *Id.*

### 3.   The ALJ's Findings

On March 10, 2005, the ALJ issued the following findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 2007.

2.   The claimant has not engaged in any substantial gainful activity since the alleged onset of disability.

3.   The claimant's depression and anxiety are considered "severe" based on the requirements in the Regulations (20 CFR § 404.1520(c)).

4.   These medically determinable impairments do not, singly or in combination, meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional capacity: No exertional limitations, but is limited to simple, unskilled work which is essentially isolated, with only occasional contact with coworkers and occasional supervision, and work which is low stress, defined as only requiring occasional decision-making.

7.   The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

15

8.   The claimant is an "individual of advanced age" (20 CFR § 404.1563).

9.   The claimant has a "limited education" (20 CFR § 404.1564).

10.  The claimant has no transferable skills from any past relevant work
     (20 CFR § 404.1568).

11.  The claimant has the residual functional capacity to perform the physical
     demands of work at all exertional levels (20 CFR § 404.1567).

12.  Although the claimant's nonexertional limitations do not allow her to
     perform the full range of work at all exertional levels, using Medical-
     Vocational Rule 204.00 as a framework for decision-making, there are a
     significant number of jobs in the national economy that she could perform.
     Examples of such jobs include work as an assembler, non precision
     (324,000 jobs in the national economy and 4000 jobs in the regional
     economy) and hand packer (329,000 jobs in the national economy and
     1400 jobs in the regional economy).

13.  The claimant was not under a "disability," as defined in the Social Security
     Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

Tr. at 30.

## III. STANDARD OF REVIEW

### A.   Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c). In determining the appropriateness of summary judgment, the Court must

"review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the

nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves

v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal citation and quotation

marks omitted). If the Court is able to determine that "there is no genuine issue as to any material

fact" and that the movant is entitled to judgment as a matter of law, summary judgment is

16

appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## B.    Review Of ALJ Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. Jul. 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really

17

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV. DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir.1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.
20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do

despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id*. In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B.    Kendall's Arguments On Appeal

On appeal, Kendall presents five arguments: (1) the ALJ failed to consider certain regulations, which may mandate a finding of disability based on Kendall's age, education, lack of transferable skills, the severity of her mental impairments, and her inability to perform her past work; (2) there was no substantial evidence in the record to support the ALJ's findings that Kendall's testimony was not totally credible; (3) the ALJ did not give sufficient weight to the medical opinions of Kendall's treating physicians; (4) the vocational expert's testimony was improper for lack of specificity and based on a flawed hypothetical question; and (5) the

20

Commissioner's subsequent determination, upon Kendall's re-filing, that Kendall was disabled as of the day after the ALJ's decision supports her contention that she was disabled prior to the ALJ's decision.

As explained below, the Court will remand this matter with directions that the ALJ consider the regulations identified by Kendall. However, the Court finds substantial evidence to support the ALJ's decision on each of the other four points Kendall has raised.

### 1.    The ALJ Did Not Consider Applicable Regulations

Kendall argues that two Social Security Rulings ("S.S.R.") mandate that she be found disabled, given the ALJ's findings that she was of advanced age, had severe anxiety and depression, could not perform her past relevant work, possessed a limited education, and had no transferable skills. (D.I. 16 at 16)  The Commissioner responds that the S.S.R.s to which Kendall refers apply only to claimants who have no work experience at all, no recent and relevant work experience, or no relevant work experience. (D.I. 20 at 20-21)  Kendall, the Commissioner contends, had recent and relevant work experience as a food service manager from August 1994 until February 6, 2002, just four days before she claimed to have become disabled. (D.I. 20 at 2, 20)  The Court finds that the S.S.R.s are applicable and must be considered by the Commissioner on remand.

S.S.R. 82-63, 1982 WL 31390 (1982), describes "Medical-Vocational Profiles Showing an Inability to Make an Adjustment to Other Work." It provides that "[w]hen an adjudicator has reached the last step of the sequential evaluation process . . . he or she must consider two medial-vocational profiles . . . ." *Id.* at *2 (emphasis added).  The second of these two profile relates to

21

"Special 'No Work Experience' Cases." *Id.* at *3. Claimants within this profile are usually not able to adjust to new work:

> Generally, where an individual of advanced age with no relevant work experience has a limited education or less, a finding of an inability to make a vocational adjustment to substantial work will be made, provided his or her impairment(s) is severe, i.e., significantly limits his or her physical or mental capacity to perform basic work-related functions.

*Id.* at *4 (emphasis added).

Although at certain points S.S.R. 82-63 describes the "No Work Experience" profile as relating to claimants having no work experience or no relevant and recent work experience, elsewhere the S.S.R. explains that claimants who have reached an "advanced age" might have to be treated as having no relevant and recent work experience even if they have, in fact, worked. The S.S.R. states:

> [U]p to a point, all other factors being equal, claimants without work experience and those who have performed only unskilled work would be treated the same. That point is advanced age. . . .
>
> Generally, individuals are considered as having no recent and relevant work experience when they have either performed no work activity within the 15-year period prior to the point at which the claim is being considered for adjudication, or the work activity performed within this 15-year period does not (on the basis of job content, recency, or duration) enhance present work capability.

*Id.* at *2-3 (emphasis added). Therefore, within the second profile set out in S.S.R. 82-63, that Ruling provides that an individual of advanced age who has only performed unskilled work will be treated the same as someone with no work experience or no recent and relevant work experience.

Kendall comes within this profile. There is substantial evidence supporting the ALJ's findings that Kendall has severe impairments (anxiety and depression), is of advanced age, has a limited education, and "has no transferable skills from any past relevant work as her past relevant work was unskilled." Tr. at 29. Further, as the ALJ appropriately found, "[t]he claimant's ability to work is significantly compromised at all exertional levels due to her non-exertional limitations." Tr. at 29. Therefore, Kendall's prior work activity does not enhance her present work capability; to the contrary, a finding of inability to make a vocational adjustment is likely.

Having found that S.S.R. 82-63 applies, the question next becomes what to do about it. Kendall insists that the S.S.R. mandates that the Court determine she is disabled. She emphasizes the following statement found in S.S.R. 82-63:

> The policy decision, in effect, directs a finding of disability where a person has a severe impairment of any nature, is of advanced age, has only the limited educational competence required for unskilled work, and has no work experience at all or no recent and relevant work experience.

*Id.* at *2 (emphasis added).[4] However, later the same S.S.R. seems merely to impose a presumption, not a mandate, of disability. It states that in circumstances such as those presented here, "the conclusion would generally follow that the claimant . . . is under a disability." *Id.* at *4 (emphasis added).

This interpretation is supported by the other regulation on which Kendall relies. S.S.R. 85-15, 1985 WL 56857 (1985), entitled "Capability to Do Other Work – The Medical-Vocational

---

[4]For the reasons already described, the Court rejects the Commissioner's argument that this language applies only to individuals with no work experience or no recent and relevant work experience. Other provisions of S.S.R. 82-63 explain that individuals of advanced age whose only work experience is unskilled (and who meet the other criteria specified) are treated the same as individuals having no work experience.

23

Rules as a Framework for Evaluating Solely Nonexertional Impairments," lists "Examples of Nonexertional Impairments and Their Effects on the Occupational Base." Example 2 provides as follows:

> Someone who is of advanced age, has a limited education, has no relevant work experience, and has more than a nonsevere mental impairment *will generally be found disabled.*

*Id.* at *5 (emphasis added) (citing S.S.R. 82-63). Kendall argues (somewhat inconsistently with her interpretation of S.S.R. 82-63 as mandating a finding of disability) that she "is the person in example 2" of S.S.R. 85-15. (D.I. 16 at 21)

The ALJ did not refer to and does not appear to have considered either of these S.S.R.s or their guidance that "generally" an individual with Kendall's characteristics will be found disabled. Therefore, this matter will be remanded. On remand, in determining whether Kendall was disabled at any point between February 10, 2002 and March 10, 2005, the Commissioner must consider S.S.R. 82-63 and S.S.R. 85-15 and the policy that individuals like Kendall are "generally" found disabled.

### 2. The ALJ's Finding That Kendall Was "Generally" But Not Fully Credible

The ALJ declared Kendall's testimony "to be generally credible and consistent with the evidence," but went on to find that "the medical evidence of record as well as the claimant's self-reported activities of daily living do not fully support the level of severity alleged." Tr. at 25. Kendall argues that there is no substantial evidence to support the finding that her testimony as to her subjective complaints was not fully credible. (D.I. 16 at 17, 24-25; D.I. 21 at 3)

In determining a claimant's residual functional capacity, the ALJ is empowered to evaluate the credibility of witnesses regarding the claimant's subjective complaints. *See* 20

24

C.F.R. § 404.1529 (d)(4); *see also Van Horn v Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). The claimant's subjective complaints must be supported by objective clinical signs or laboratory findings which demonstrate the existence of a medically determinable impairment. *See* 20 C.F.R. § 404.1529(b). Once the ALJ has concluded that objective medical evidence shows that a medically determinable impairment could have caused the claimant's alleged symptoms, the ALJ must evaluate the "intensity and persistence" of the claimant's symptoms to determine how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). This necessarily requires the ALJ to decide the extent to which the claimant "is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). An ALJ's credibility determination is entitled to deference and should not be discarded lightly, particularly given the ALJ's opportunity to observe an individual's demeanor. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

Here, the ALJ concluded that Kendall had medically discernible conditions – depression and anxiety – capable of causing the symptoms Kendall alleged, but found that Kendall's own testimony as to her daily activities and the findings of the state agency medical and psychological consultants suggested that she partly exaggerated their severity. Tr. at 24-28.

At the hearing, Kendall characterized her depression and anxiety as debilitating. Tr. at 266. She testified that she cries frequently and that she wished she were dead. Tr. at 270. She stated that she could not concentrate and that "her mind is just blank." Tr at 271, 283. She further testified to feelings of helplessness and hopelessness and frequent mood swings: "From thinking, oh, I can get out of this . . . . And then the next minute, it just goes down . . . you're

worthless. You're never going to get out of this mess." Tr. at 271-72. She also testified to a history of panic attacks at work. Tr. at 272.

However, when testifying to her activities since the onset of her alleged disability, Kendall stated that she looked for a new job and prepared resumes for one year before deciding to apply for DIB. Tr. at 265-66. She testified that she cleaned her own bathtub; prepared meals; drove herself to her weekly therapy appointments and other doctor appointments; did her own grocery shopping (albeit first thing in the morning to avoid crowds); took care of her ten pet chickens and two cats; and received visits from her daughters. Tr. at 280-83. She had one close friend to whom she spoke by phone every 2-3 weeks. Tr at 284-85. She credited her therapist with enabling her to apply for a library card and check out a book and expressed a desire to check out more books when the weather permitted. Tr. at 273-74, 286. She also acknowledged that the medication she had been prescribed since resuming treatment had made her symptoms "somewhat better." Tr. at 273. Kendall explained that she was promoted to a managerial position at her last job in spite of her high absentee rate because "they liked me. I was a good worker when I worked." Tr. at 295. Asked on cross-examination if her reason for not socializing was because she did not have money or because she chose not to have friends, she responded, "[i]t's a little bit of both." Tr. at 285. She also stated that she "got into" following NASCAR racing since she had left work. Tr. at 287.

It is well established that an ALJ may consider a claimant's ability to clean, shop, cook, and maintain a residence in determining her ability to work. *See* 20 C.F.R. Pt. 404, Subpt. P, 12.00(C), App. 1 (2005). Nevertheless, this Court has cautioned against giving those factors "improper weight," noting that for a claimant "who suffers from an affective or personality

26

disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Dass v. Barnhart,* 386 F. Supp. 2d 568, 577 (D. Del. 2005). The ALJ must, therefore, also evaluate the claimant's ability to function outside the structured environment of the home. *See id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.00(F) (2005).

In assessing Kendall's RFC, the ALJ appropriately took note of some of her home-centered daily activities (including caring for her pets, cooking, visiting with family, and maintaining a long-time friendship) and activities related to her mental health treatment (driving to her doctor and therapy appointments and being cooperative and engaged with her mental health providers). Tr. at 28. The Court finds that these activities were not given improper weight. There is substantial evidence in the record (and recited above) regarding Kendall's ability to function outside the home and clinical environment to support the ALJ's finding that Kendall's testimony as to her subjective symptoms, while generally credible, was overstated.

The ALJ also found that Kendall's medical record was not consistent with her allegations of debilitating anxiety. Dr. Rummler's mental health examination found Kendall cooperative with an only mildly constricted affect. Tr. at 142. He diagnosed her with "mild" major depression, with moderate symptoms, and concluded that her symptoms would not significantly impair her ability to work. Tr. at 142-43. Dr. Jensen found Kendall outgoing and communicative, and noted no restrictions on her ability to sit, stand, walk, lift, hear, speak, carry and handle objects, or travel. Tr. at 144-46. Drs. Hakkarinen, Butler, and Apacible, three state agency medical consultants and physicians, affirmed these findings. Tr. at 152, 134-37.

The Court finds that, taken as a whole, the objective medical evidence in this case supports the ALJ's conclusion that Kendall was "generally credible." In making this

27

determination, the Court notes that it cannot and does not re-weigh the evidence of record. *See*

*Monsour*, 806 F.2d at 1190-91. Dr. Rummler's mental health evaluation, subsequently affirmed

by three non-evaluating physicians, directly contradicts Kendall's assessment of a debilitating

depression and anxiety. Furthermore, four months before her ALJ hearing, her treating

psychiatrist, Dr. Prasad, found her to have a GAF indicative of only moderate symptoms of

depression. Tr. at 224. Taken together with the other evidence already cited above, the Court

thus finds that the medical record provides substantial evidence in support of the ALJ's

credibility determination.

### 3.    The ALJ's Weighing Of The Treating And Non-Treating Physicians' Opinions

Kendall argues that the ALJ erred in crediting the opinions of the state agency physicians

over those of her treating physicians. In order to determine the proper weight to be given to a

medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts.

*See Richardson v. Perales*, 402 U.S. 389, 399 (1971). The opinions of treating physicians are

generally afforded greater weight, though only when they are supported by medically acceptable

clinical and laboratory diagnostic techniques and are not inconsistent with other substantial

evidence in the record. 20 C.F.R. § 404.1527(d)(2); *see also Boulanger v. Astrue*, 520 F.Supp.2d

560, 575 (D. Del. 2007).

If the treating physician's opinion is found not controlling, the ALJ must consider

numerous factors to determine its relative weight, including: (1) duration of the treatment

relationship; (2) nature and extent of the relationship; (3) supportability; (4) consistency with the

record as a whole; and (5) specialization of the treating physician. *See* 20 C.F.R.

§ 404.1527(d)(2). The ALJ must "give specific reasons for the weight given to the treating

28

source's opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight given to the treating source's medical opinion and the reasons for that weight." *Jopson v. Astrue*, 517 F.Supp.2d 689, 702 (D. Del. 2007). Failure to do so leaves the reviewing court unable to determine if "significant probative evidence was not credited or if it was simply ignored." *Id.* (internal citation omitted).

The ALJ only partially accepted Dr. Wun's opinion that Kendall experienced a mild restriction in activities of daily living; moderate difficulties in social functioning; frequent difficulty in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. Tr. at 168. The ALJ instead gave greater weight to the opinion of Dr. Rummler, the state agency physician, because: Dr. Rummler is a mental health specialist (while Dr. Wun is an internist), Dr. Rummler's finding was more consistent with Kendall's self-reported activities of daily living, and Dr. Rummler's finding was more consistent with Kendall's demeanor at the administrative hearing (where Kendall made good eye contact, did not appear nervous or anxious, and failed to demonstrate any difficulties with concentration or memory). Tr at 27.

The Court finds substantial evidence in support of the ALJ's finding that Dr. Wun's opinion is not entitled to controlling weight. Over more than twenty years of treating Kendall, Dr. Wun's notes cite only a single potential episode of decompensation – the January 2002 appointment during which Kendall described becoming withdrawn and enclosing herself in a dark room. Tr. at 171. After Dr. Wun referred Kendall to a psychiatrist, she reported no complaints but, instead, an improvement in her anxiety at her follow-up appointment in February 2002. Tr. at 171, 169. From the time Kendall resumed treatment with Dr. Wun in February 2004

29

until his evaluation two months later, Kendall was found to be suffering from anxiety, but there are no references to frequent difficulties with concentration, persistence, or pace, and no mention of repeated episodes of decompensation. Tr. at 166-69. Dr. Wun's opinions are thus inconsistent with both his own treatment record and with the findings of the state agency physicians. Having determined that Dr. Wun's findings were not entitled to controlling weight, the ALJ correctly considered that Dr. Wun is an internist and not a mental health specialist, the lack of support offered for Dr. Wun's findings, and the inconsistency between Dr. Wun's findings and those of the state physicians. Therefore, substantial evidence supports the ALJ's decision to afford Dr. Wun's opinion comparatively little weight.

The ALJ also did "not afford significant weight" to the January 2005 opinion of the treating psychiatrist, Dr. Prasad, that Kendall had marked limitations in activities of daily living, maintaining social functioning, or concentration, persistence, and pace. Tr. at 27, 233. The Court finds that there is substantial evidence to support the ALJ's finding that Dr. Prasad's opinion is largely at odds with her own record of Kendall's treatment at Regional Mid-Shore Mental Health Services. Tr. at 27-28. Upon renewing treatment at Regional Mid-Shore in October 2004, Kendall was assigned a GAF of 48 (linked to serious impairment in occupational functioning) and a highest previous year GAF of 55 (indicative of moderate impairment). Tr. at 227. However, at Kendall's next appointment less than a month later, the psychiatric nurse noted an improvement and Dr. Prasad assigned Kendall a GAF of 55 and maximum previous year GAF of 60 (both indicative of only moderate difficulties in occupational functioning). Tr. at 222-25. Kendall was tearful and depressed over the rest of November, but after Dr. Prasad increased the dosage of her psychiatric medication, her mood improved over December 2004 and January

2005. Tr. at 216-21. Kendall reported to Dr. Prasad that she was thinking about returning to work but was not yet ready and did not want to do anything to spoil her bright mood. Tr. at 215-16. The doctor suggested an eight week interval before her next appointment. Tr. at 216. Kendall's report to the treating psychiatric nurse that she kept an album chronicling her hobby, NASCAR racing, is also inconsistent with a finding of a marked deficiency in concentration. Tr at 27, 230.

Kendall seeks to bolster her argument that the treating physicians' opinions were well-supported by citing mental health records that were not submitted as evidence to the ALJ. (D.I. 16 at 6-10, 22-23, 26) Several of these records were first referenced in a memorandum in support of her request for review to the Appeals Council. Tr. at 244-48. However, evidence that was not presented to the ALJ may not be considered in determining whether the ALJ's decision is supported by substantial evidence. *See Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991).[5]

### 4.    The ALJ's Acceptance Of The Testimony Of The Vocational Expert

Kendall's fourth asserted argument for error is that the hypothetical question the ALJ posed to the vocational expert did not contain Kendall's actual limitations. (D.I. 16 at 17, 25) "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

---

[5]Evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Thus, the evidence that Kendall submitted for the first time to this Court or the Appeals Council will be evaluated in the final section below.

The ALJ posed this question to the Vocational Expert:

> Now, if we were to consider a hypothetical individual who was about the
> claimant's day to day onset, 57 years, 10th grade education, the work history that
> you have just talked about. This person has an unskilled work background. This
> person would not have any exertional limitations, but nonexertionally, obviously
> with an unskilled background. Limited to simple unskilled work. Work which
> would have only occasional contact with coworkers and the public. Work that is
> essentially isolated with only occasional supervision. And work that's low stress,
> defined as only occasional decision making required for that job. With these
> limitations would such a person be able to do any of the claimant's past relevant
> work in your opinion?

Tr. at 59.

This hypothetical question encompasses Kendall's limited education, advanced age,
history of unskilled work, and exertional and non-exertional limitations. The further instruction
that the claimant is limited to essentially isolated, low stress work involving occasional decision
making reflects the ALJ's assessment of Kendall's RFC and her determination that Kendall
suffered from "severe" depression and anxiety that did not meet any of the listed impairments in
Appendix 1, Subpart P, Regulation No. 4. Tr. at 26, 29-30, 140-43, 149-64. Kendall's
argument, then, is not that the ALJ's question failed to pose limitations identified in the RFC
assessment; rather, she argues that the ALJ's RFC determination was incorrect. As discussed
above, the Court has already determined that the ALJ's determination of Kendall's RFC is
supported by substantial evidence in the record.

Kendall also argues that the substance of the ALJ's testimony – that there are 4000 non-
precision assembly positions and 1500 packer positions within a certain radius of Dover,
Delaware – is "unrealistic" and "preposterous." (D.I. 16 at 25) Kendall, however, has never
challenged the vocational expert's qualifications and did not cross-examine this portion of the

32

expert's testimony at the hearing. The Court finds there is substantial evidence to support the ALJ's reliance on the vocational expert's testimony.

### 5.   Kendall's "New" Evidence

Kendall's final assertion is that this matter must be remanded as a result of a November 20, 2005 Notice of Award from the Social Security Administration, finding that she became disabled under SSA rules on March 11, 2005 – that is, the day after the decision denying her benefits in the instant case became final. (D.I. 16, Ex. B) She argues that "there is no logical reason" to support the idea that she became disabled one day after the ALJ's decision ruling against her. (D.I. 16 at 26) She cites to a case from the Southern District of West Virginia, *Bradley v. Barnhart*, 463 F.Supp.2d 577 (S.D.W.Va., 2006), which held that an award of DIB based on a second application – listing, as here, a disability onset date of the day after the initial application was denied – constituted new and material evidence that entitled the claimant to a remand as to the initial application. (D.I. 23)

In the Third Circuit, however, in order for evidence that was not submitted to the ALJ to be considered by a District Court as a basis for remand, the evidence "must not only be new and material but also be supported by a demonstration by claimant of good cause for not having incorporated the new evidence into the administrative record." *Matthews*, 239 F.3d at 592 (internal citation omitted). "New evidence" must actually be "new" and "not merely cumulative of what is already in the record." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). In order for evidence to be deemed "material," "it must be relevant and probative" and present a reasonable possibility that it would have altered the outcome of the Commissioner's determination. *Id.* Thus, "[a]n implicit materiality requirement is that the new

evidence relate to the time period for which benefits were denied, and that it *not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.*" *Id.* (emphasis added). Finally, the "good cause" element requires the claimant to articulate a "good reason" for having failed to present the evidence to the ALJ. *Matthews*, 239 F.3d at 592.

The November 20, 2005 Notice of Award is just the sort of evidence of a later-acquired disability or subsequent deterioration of a previously non-disabling condition that the Third Circuit has held does not meet the materiality requirement. Nor has Kendall provided evidence to suggest that the second, favorable decision relied on medical reports made prior to March 10, 2005. Accordingly, the Court concludes that Kendall's "new" evidence does not provide a basis for a remand.[6]

## V. CONCLUSION

Accordingly, for the reasons set forth in this Memorandum Opinion, Kendall's motion for summary judgment will be GRANTED in part and DENIED in part and the Commissioner's motion for summary judgment will be DENIED. The decision of the Commissioner dated March 10, 2005 will be reversed and this matter will be remanded to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion. An appropriate Order follows.

---

[6]Kendall has also placed in the Court record mental health treatment records that were not in the record before the ALJ (although some of them were presented to the Appeals Council). *See* D.I. 22, Ex. A, Tr. 244-48. The only explanation Kendall provides is that these records did not appear in her original file "for unknown reasons." (D.I. 16 at 6) The Court finds that each of these records are cumulative of other treatment materials that were already in the record before the ALJ, would not have altered the Commissioner's determination, or concern a period after the March 10, 2005 determination at issue here.